**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WILLIAM MILLER, Derivatively on Behalf of BELLRING BRANDS, INC.,

Plaintiff,

v.

DARCY HORN DAVENPORT, ROBERT V. VITALE, THOMAS P. ERICKSON, ELLIOT H. STEIN, JR., JENNIFER KUPERMAN JOHNSON, CHONDA J. NWAMU, SHAWN W. CONWAY, and DAVID I. FINKELSTEIN,

Defendants,

-and-

BELLRING BRANDS, INC.,

Nominal Defendant.

Civil Action No. 1:26-cv-

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff William Miller ("Plaintiff"), by his undersigned attorneys, brings this stockholder derivative action in the right and for the benefit of nominal defendant BellRing Brands, Inc. ("BellRing" or the "Company") against the BellRing Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duties and violations of the federal securities laws. Plaintiff alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief, which includes, but is not limited to, investigation of counsel, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud class action complaint filed against the Company and certain of its current and former officers and directors, *Denha v. BellRing Brands,*

*Inc., et al.*, Case No. 1:26-cv-00575-JSR (S.D.N.Y.) (the "Securities Class Action"), transcripts of the Company's conference calls with financial analysts and investors, published news reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. BellRing is a consumer-packaged goods company that develops, markets, and sells convenient nutrition products, primarily ready-to-drink ("RTD") protein shakes and powders under its flagship Premier Protein brand. In fiscal 2025, the Company's Premier Protein brand reported $216.2 million in earnings, representing approximately 86% of the Company's $2.3 billion in net sales. Three customers—Walmart (including Sam's Club), Costco, and Amazon—collectively represented approximately 74% of the Company's net sales.

2. In 2024, as BellRing expanded its manufacturing capacity, the Company's key retail customers began stockpiling excess inventory as a safeguard against product shortages that had previously constrained supply. BellRing's reported sales growth was materially attributable to this temporary retailer inventory buildup. The Individual Defendants knew that once retailers built their product stockpiles from which the reported revenue growth was derived, they would reduce their purchases as they sold their substantial inventories, creating a material headwind to the Company's sales, revenues and earnings.

3. The Individual Defendants also knew that competitive pressures in the RTD protein category were intensifying as capacity constraints eased industry-wide, threatening BellRing's market position.

4. The Individual Defendants concealed these failures from stockholders by causing or permitting BellRing, its directors and officers to issue materially false and misleading statements in SEC filings, press releases, and earnings conference calls, falsely attributing the Company's strong sales growth to "organic growth," new "demand drivers," "distribution gains," "incremental promotional activity," and "strong macro tailwinds around protein," while insisting the Company held a "competitive moat" in the RTD category.

5. On May 6, 2025, the truth began to emerge when BellRing's Chief Financial Officer ("CFO") Paul A. Rode ("Rode") revealed that "several key retailers" had lowered their supply stock and Defendant Darcy Horn Davenport, BellRing's Chief Executive Officer ("CEO"), admitted that retailers had been "hoarding inventory" in order to protect themselves "coming out of capacity constraints." Davenport further acknowledged that the Company had known all along that retailers were temporarily stockpiling inventory and the Company's growth would stagnate once retailers finished stocking, admitting: "We thought this could happen."

6. On this news, BellRing's stock price fell approximately 19%, from $78.43 to $63.55 per share. However, not all stockholders were equally affected as while the Company's stock was inflated by the false and misleading statements alleged herein, Defendants Robert V. Vitale ("Vitale") and Davenport (the "Insider Seller Defendants") sold approximately $29.0 million in BellRing stock, including approximately $28.1 million by Chairman Vitale during a concentrated two-week period in February 2025 at prices near the stock's all-time high—approximately 2.5 months before the first corrective disclosure.

7. On August 5, 2025, the full extent of the Individual Defendants' misconduct was revealed when Davenport acknowledged that "several other competitors gained . . . space" in a key retail channel and noted that the Company was not surprised to see new entrants to the

market—directly contradicting her prior "competitive moat" representation approximately six months earlier. On this news, BellRing's stock price fell approximately 33%, from $53.64 to $36.18 per share.

8. As a result of the Individual Defendants' misconduct, BellRing has suffered the destruction of over $2.9 billion in market capitalization. The damage continues since on January 22, 2026, the Securities Class Action was filed in the United States District Court for the Southern District of New York against the Company, its CEO and CFO seeking substantial damages on behalf of a class of persons and entities that purchased BellRing stock while it was inflated by materially false and misleading statements and omissions. BellRing will incur substantial costs defending itself and its officers in the Securities Class Action and faces further substantial costs in the event of an adverse judgment.

9. Plaintiff did not make a demand on the Board to institute this action because, as set forth below, such a demand would be futile. The Individual Defendants are neither disinterested nor independent. Absent this action, BellRing will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II. JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act of 1934 ("the Exchange Act"), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11. This Court has jurisdiction over each Defendant named herein because each Defendant is either incorporated and maintains operations within this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), where the Company is incorporated and where it conducts substantial business.

## III. THE PARTIES

### A. Plaintiff

13. Plaintiff William Miller has been a stockholder of BellRing since September 18, 2024 and has held shares of BellRing common stock continuously since that time. As such, Plaintiff was a stockholder at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of BellRing in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

### B. Nominal Defendant

14. Nominal Defendant BellRing Brands, Inc. is a Delaware corporation with its principal executive offices at 1 N Brentwood Blvd., Suite 1550, St. Louis, Missouri 63105. BellRing's common stock trades on the NYSE under the ticker symbol "BRBR." BellRing is named solely as a nominal party in this action.

### C. Individual Defendants

15. Defendant Vitale has served as Chairman of the Board of BellRing since September 2019. Vitale served as Executive Chairman from September 2019 through November 2024 and

transitioned to the non-executive Chairman position in November 2024. Vitale also serves as President and Chief Executive Officer of Post Holdings, Inc. ("Post Holdings"), BellRing's former parent company, and has served as Chairman of Post Holdings' board since December 2025. Vitale is not an independent director and BellRing's 2025 Proxy Statement accordingly does not list Vitale as an independent director. Between February 10 and February 24, 2025, Vitale sold 368,334 shares of BellRing common stock for total proceeds of approximately $28.1 million. Since fiscal year 2023, Vitale has received the following compensation from BellRing:

| | **FY2023** | **FY2024** | **FY2025** |
|---|---|---|---|
| Salary | $85,000 | $85,000 | $85,000 |
| Stock Awards | $135,000 | $135,000 | $135,000 |
| Non-Equity Incentive | $90,000 | $90,000 | $90,000 |
| All Other | $43,690 | $55,082 | $48,750 |
| **Total** | **$353,690** | **$365,082** | **$358,750** |

16. Defendant Davenport has served as President and Chief Executive Officer of BellRing since September 2019 and as a director since October 2019. Davenport is not an independent director and accordingly BellRing's 2025 Proxy Statement does not list Davenport as an independent director. Between May 30 and August 1, 2025, Davenport sold 16,000 BellRing shares for approximately $931,065. Since fiscal year 2023, Davenport has received the following compensation from BellRing:

| | **FY2023** | **FY2024** | **FY2025** |
|---|---|---|---|
| Salary | $700,000 | $750,000 | $950,025 |
| Stock Awards | $5,105,600 | $7,499,798 | $4,400,000 |
| Non-Equity Incentive | $875,000 | $1,406,250 | $1,055,715 |
| All Other | $121,304 | $245,605 | $157,799 |
| **Total** | **$6,801,904** | **$9,901,653** | **$6,563,539** |

17. Thomas P. Erickson ("Erickson") has served as a BellRing director since October 2019 and as Lead Independent Director since July 30, 2025. Erickson serves as Chair of the Audit

Committee and is designated the Audit Committee financial expert. Erickson is also a member of the Corporate Governance and Compensation Committee, and a member of the Executive Committee. Since fiscal year 2023, Erickson has received the following compensation from BellRing:

| | FY2023 | FY2024 | FY2025 |
|---|---|---|---|
| Salary | $85,000 | $85,000 | $85,000 |
| Stock Awards | $135,000 | $135,000 | $135,000 |
| Non-Equity Incentive | $30,000 | $30,000 | $30,000 |
| All Other | $41,310 | $47,250 | $48,750 |
| **Total** | **$291,310** | **$297,250** | **$298,750** |

18. Elliot H. Stein, Jr. ("Stein") has served as a BellRing director since October 2019. Stein is a member of the Audit Committee and Executive Committee. Stein has also served as a director of MidCap Financial Investment Corporation, an Apollo Global Management–managed business development company, since 2004, and as a director of MidCap Apollo Institutional Private Lending since 2023. Stein previously served on the boards of Apollo Senior Floating Rate Fund from 2011–2024 and Apollo Tactical Income Fund from 2013–2024. Stein is also Chairman of Acertas LLC and Senturion Forecasting LLC, data analytics firms, and was formerly Managing Director of Commonwealth Capital Partners LP, a private equity firm. Since fiscal year 2023, Stein has received the following compensation from BellRing:

| | FY2023 | FY2024 | FY2025 |
|---|---|---|---|
| Salary | $85,000 | $85,000 | $85,000 |
| Stock Awards | $135,000 | $135,000 | $135,000 |
| Non-Equity Incentive | $10,000 | $10,000 | $10,000 |
| All Other | $41,310 | $47,250 | $48,750 |
| **Total** | **$271,310** | **$277,250** | **$278,750** |

19. Jennifer Kuperman Johnson ("Johnson") has served as a BellRing director since October 2019. Johnson is a member of the Corporate Governance and Compensation Committee

and the Executive Committee. Johnson also serves on the board of directors of Post Holdings and Post Holdings Partnering Corporation, a special purpose acquisition company affiliated with Post Holdings. Since fiscal year 2023, Johnson has received the following compensation from BellRing:

| | FY2023 | FY2024 | FY2025 |
|---|---|---|---|
| Salary | $85,000 | $85,000 | $85,000 |
| Stock Awards | $135,000 | $135,000 | $135,000 |
| Non-Equity Incentive | $7,500 | $7,500 | $7,500 |
| All Other | $41,310 | $47,250 | $48,750 |
| **Total** | **$268,810** | **$274,750** | **$276,250** |

20. Chonda J. Nwamu ("Nwamu") has served as a BellRing director since May 2021. Nwamu is a member of the Audit Committee. Since fiscal year 2023, Nwamu has received the following compensation from BellRing:

| | FY2023 | FY2024 | FY2025 |
|---|---|---|---|
| Salary | $85,000 | $85,000 | $85,000 |
| Stock Awards | $135,000 | $135,000 | $135,000 |
| Non-Equity Incentive | $10,000 | $10,000 | $10,000 |
| All Other | $28,333 | $47,250 | $48,750 |
| **Total** | **$258,333** | **$277,250** | **$278,750** |

21. Shawn W. Conway ("Conway") has served as a BellRing director since October 2023. Conway serves as Chair of the Corporate Governance and Compensation Committee. Since fiscal year 2024, Conway has received the following compensation from BellRing:

| | FY2024 | FY2025 |
|---|---|---|
| Salary | $85,000 | $85,000 |
| Stock Awards | $135,000 | $135,000 |
| Non-Equity Incentive | $15,000 | $15,000 |
| All Other | $25,000 | $48,750 |
| **Total** | **$260,000** | **$283,750** |

22. David I. Finkelstein ("Finkelstein") has served as a BellRing director since January 1, 2026. Finkelstein is a member of the Audit Committee.

23. Defendants Vitale and Davenport are referred to collectively herein as the "Insider Seller Defendants."

24. Defendants Vitale, Davenport, Erickson, Stein, Johnson, Nwamu, Conway, and Finkelstein are referred to collectively herein as the "Individual Defendants."

## IV. THE INDIVIDUAL DEFENDANTS' DUTIES

25. By reason of their positions as officers and directors of BellRing, each of the Individual Defendants owed and owes BellRing and its stockholders fiduciary obligations of loyalty, good faith, due care, and candor, and was and is required to use their utmost ability to control, manage, and oversee the business and affairs of the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BellRing and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

26. Each director and officer of the Company owes a fiduciary duty to BellRing and its stockholders to exercise good faith and diligence in the administration of the affairs of the Company, including establishing and maintaining adequate financial controls and accurately and truthfully reporting the Company's financial condition and compliance with applicable laws.

27. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) exercise good faith and ensure that the Company's affairs were conducted in an efficient, business-like manner;

(b) exercise good faith and ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, and regulations;

(c) exercise good faith and ensure that the Company was not engaged in the misconduct alleged herein;

(d) ensure that the Company disclosed in its regulatory filings with the SEC all material facts so that the market price of the Company's stock would be based upon accurate information;

(e) exercise good faith in directing the business and affairs of the Company, including the consideration and payment of any distributions;

(f) refrain from unduly benefiting themselves and other BellRing insiders at the expense of the Company;

(g) not use their positions of control to engage in improper self-dealing or reap personal financial benefits at the expense of the Company; and

(h) exercise good faith to ensure that the Company's executive and director compensation was reasonable and not excessive.

28. As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the NYSE, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning BellRing's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in

its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over BellRing's management, policies, and internal controls.

29. At all times relevant hereto, the Individual Defendants were the agents of each other and BellRing and were always acting within the course and scope of such agency.

30. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at BellRing.

**A. Duties Under BellRing's Code Of Business Conduct And Ethics**

31. BellRing's Code of Business Conduct and Ethics (the "Code of Conduct"), signed by CEO Davenport, applies to all employees, officers, and directors of the Company. The Code of Conduct requires that:

> We are committed to maintaining our financial books and records with the highest degree of accuracy, completeness and integrity. We maintain accounting and internal control systems designed to safeguard against loss and ensure Company records are reliable for preparing financial statements. No fraudulent or false entries should be made in the books, records or accounts of the Company. We recognize that our investors rely on our books and records for an accurate and transparent view of the Company's condition.

32. The Code of Conduct further prohibits insider trading and "tipping" (communicating inside information to anyone who might use it to purchase or sell securities) and requires compliance with all applicable securities laws and the rules of the NYSE. The Code of Conduct provides a robust whistleblower framework, including an anonymous Employee Speak Up Line staffed by an independent third-party provider, available 24 hours a day, seven days a week. The Code of Conduct further provides that "[a]ny act or retaliation against any person who, in good faith, reports any actual or suspected violation or participates in an investigation is strictly prohibited."

**B. Additional Duties Under BellRing's Corporate Governance Guidelines**

33. BellRing's Corporate Governance Guidelines, effective July 30, 2025, provide that:

> The responsibility of the Board is to supervise and direct the management of the Company in the best interest of the Company's stockholders. The Board shall at all times represent the interests of the Company's stockholders and exhibit high standards of integrity, commitment and independence of thought and judgment.

34. The Guidelines require that a majority of the Board be independent and that the independent directors "shall meet in regularly scheduled executive sessions without management no fewer than four times a year." The Guidelines further mandate the appointment of a Lead Director whenever the Chairman is not independent, with responsibilities including to "[w]ork with the Chief Executive Officer to develop the Board and Committee agendas and approve the final agendas" and to "[c]oordinate, develop the agenda for and chair executive sessions of the Board's independent directors." The Guidelines require the CEO to annually provide the Board with an assessment of the Company's executive officers, their potential successors, and a short-term succession plan providing for temporary delegation of authority.

**C. Additional Duties Of Audit Committee Members**

35. The Audit Committee Charter, effective July 30, 2025, provides that the Committee's purpose is to:

> [O]versee and exercise the powers and authority granted by the Board in matters relating to (i) the quality and integrity of the Company's financial statements and financial reporting, (ii) the Company's compliance with legal and regulatory requirements, codes of conduct and ethics programs established by management and the Board, (iii) the independence and qualifications of the Company's independent registered public accounting firm . . . (iv) the Company's systems of internal accounting and financial controls and disclosure controls.

36. The Charter further requires the Audit Committee to "[o]versee the Company's enterprise-wide risk management program and receive reports from appropriate business and functional unit management on risk matters," and to "[o]versee management's development and

implementation of policies and processes relating to risk assessment, management, mitigation, and reporting including limits and tolerances, risk roles and responsibilities, risk mitigation decisions and risk-related assumptions." The Charter also requires the Committee to "[r]eview and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies" and to "[e]stablish procedures for (1) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (2) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters."

### D. Additional Duties Of Corporate Governance And Compensation Committee Members

37. The Corporate Governance and Compensation Committee Charter, effective July 30, 2025, provides that the Committee's purpose includes "(i) developing and recommending to the Board a set of corporate governance guidelines applicable to the Company, (ii) identifying individuals qualified to become Board members, (iii) consider, select, or recommend that the Board select, the director nominees for the Company's Annual Meetings of Stockholders, (iv) discharge the Board's responsibilities relating to the compensation of the Company's executives, including Chief Executive Officer ('CEO') compensation; and (v) oversee the Company's benefit plans." The Charter further requires the Committee to "[d]evelop and recommend to the Board for approval a set of corporate governance guidelines applicable to the Company, review such guidelines at least annually, and recommend changes as necessary" and to "[a]nnually review and discuss with management the Company's compensation policies and practices as applied to employees generally to assess whether any risks arising from such policies and practices are reasonably likely to have a material adverse effect on the Company."

## V. SUBSTANTIVE ALLEGATIONS

### A. Company Background

38. BellRing is a consumer-packaged goods company focused on "convenient nutrition," primarily RTD protein shakes, powders, bars, and other protein-enriched food products. BellRing was initially formed as a subsidiary of Post Holdings and completed its Initial Public Offering ("IPO") on October 21, 2019 at $14.00 per share. Post Holdings subsequently spun off approximately 80.1% of its BellRing interest on March 10, 2022 and divested its remaining stake in November 2022 while maintaining representation on the Board through Defendants Vitale and Johnson.

39. BellRing operates an asset-light business model, relying entirely on third-party manufacturers. BellRing regularly reports "consumption" and "shipments" as key performance metrics reflecting its financial condition. When shipments materially exceed consumption, it signals retailers are building inventory ("stocking"). When consumption exceeds shipments, it signals retailers are drawing down existing inventory ("destocking"). The stocking and destocking metrics are particularly critical to measure the Company's revenue growth.

40. In the years prior to November 2024, BellRing's financial results were shaped by supply constraints. Demand from retailers frequently exceeded manufacturing capacity because retailers were stockpiling inventory in order to ensure adequate supply. Beginning in early 2024, BellRing expanded manufacturing capacity by adding third-party manufacturing partners. According to the Individual Defendants, this new capacity allowed the Company to implement certain "demand drivers" for the first time since 2021.

**B. The Board's Failure To Oversee BellRing's Transition To Demand-Driven Operations**

41. On November 18, 2024, BellRing filed a Current Report on Form 8-K with the SEC reporting its fourth quarter and fiscal year 2024 financial results, attaching a press release disclosing, among other things, fourth quarter net sales of $555.8 million, a 17.6% increase from the prior year period, and gross profit of $205.1 million, a 32.1% increase from the prior year period. The press release quoted Defendant Davenport as stating:

> We finished the year strong, with our results coming in at the high end of our expectations. . . . Our momentum remains high as we enter 2025. The convenient nutrition category continues to provide strong tailwinds, with ready-to-drink shakes and powders in the early stages of growth.

42. BellRing also reported that "Premier Protein net sales increased 20.3%, driven by 19.5% volume growth" and that "[v]olume gains were driven by organic growth and distribution gains." The next day, November 19, 2024, BellRing filed its Annual Report on Form 10-K with the SEC and held a conference call with financial analysts and investors. During the call, CFO Rode stated that "[s]hipment dollar growth outpaced consumption dollar growth," attributing this gap to "load ends of new distribution and Q1 promotions."

43. On February 3, 2025, BellRing filed a Current Report on Form 8-K reporting its first quarter fiscal year 2025 financial results, attaching a press release that disclosed, among other things, net sales of $532.9 million, a 23.8% increase from the prior year period, and gross profit of $199.6 million, a 34.9% increase from the prior year period. On February 4, 2025, BellRing held a conference call with financial analysts and investors to discuss the financial results, on which Defendant Davenport represented: "Our organization has officially pivoted to demand driving. Strong macro tailwinds around protein are driving robust long-term growth." When asked about competition, Davenport downplayed competitive threats, stating: "[F]rom a competitive

standpoint, I would say there aren't a ton of major changes. . . . the ready-to-drink category is just highly complex. . . . So it's just a much different . . . competitive moat, I would say."

44. In reality, BellRing's reported sales were materially attributable to temporary inventory stockpiling by key retail customers. Thus, the Individual Defendants knew or should have known that (a) the Company's sales growth was not driven by genuine end-consumer demand; (b) key retailers had accumulated excess inventory as a safeguard against prior supply shortages; (c) once retailers gained confidence that supply constraints had normalized, they would reduce inventory levels; and (d) competitive pressures in the RTD protein category were intensifying.

45. Multiple red flags should have alerted the Individual Defendants to the unsustainability of BellRing's reported sales growth. First, the Audit Committee had a duty to "[r]eview and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies," and the Company's own internal data showed a persistent and widening divergence between shipments and consumption—the precise metric the Company reported to investors as evidence of its growth trajectory. Second, CFO Rode's November 2024 disclosure that "[s]hipment dollar growth outpaced consumption dollar growth" was itself a warning that the Company's sales were being driven by retailer stocking rather than end-consumer demand. Third, public industry data reflected that protein RTD manufacturing capacity was expanding across the industry, with multiple new competitors entering the category, a development that was openly discussed by analysts and industry participants, as illustrated by Nestlé's Vital Proteins brand entering the RTD protein shake category with a directly competitive 30-gram protein product launched at Walmart and Costco, and by The Simply Good Foods Company's June 2024 acquisition of OWYN to expand its RTD protein distribution. Fourth, the

Company's three largest customers—Walmart (including Sam's Club), Costco, and Amazon, collectively representing approximately 74% of net sales—are among the most sophisticated retailers in the world, and their inventory management practices are well known to shift rapidly once supply constraints ease. The Board either knew and ignored these red flags or failed to implement the monitoring systems necessary to detect them.

### C. The Company Discloses That Key Retailers Are Destocking Leading To Stagnating Growth

46. On May 6, 2025, the Company filed a Current Report on Form 8-K with the SEC and attached a press release announcing the financial results for the second quarter of 2025, including net sales of $588 million, or an 18.9% increase compared to the prior year period, representing stagnating growth. On the same day, during a conference call with financial analysts and investors to discuss the financial results, CFO Rode revealed that "several key retailers lowered their weeks of supply on hand, which is expected to be a mid-single-digit headwind to our third quarter growth." Defendant Davenport admitted that the Company had known that retailers were only temporarily stockpiling inventory in response to supply constraints and BellRing's sales growth would decline in the long term as a result:

> So this is really tied to retail — so specifically one, but a couple of retailers holding on kind of protecting themselves coming out of capacity constraints. They were a little bit hoarding inventory to make sure that they didn't run out of stock on shelf. . . . ***We thought this could happen.*** We just had no idea when it would happen.

47. However, Davenport continued to misrepresent demand: "[A]bsolutely, no softness, no concern around consumption."

48. On this news, BellRing's stock fell approximately 19%, from $78.43 to $63.55 per share on May 6, 2025.

49. On August 5, 2025, BellRing narrowed its FY2025 net sales guidance to $2.28–$2.32 billion. Defendant Davenport stated that "[s]uccess attracts competition" and acknowledged

"several other competitors gained . . . space" in a key club retailer. CFO Rode acknowledged that consumption had not outpaced shipments as expected but rather "[t]hey came in more in line"—a strong indicator that consumer demand was weakening. On this news, BellRing's stock fell by approximately 33%, from $53.64 to $36.18 per share.

**D. BellRing's False and Misleading Proxy Statement**

50. On December 16, 2025, the Company filed its 2025 Proxy Statement and solicited stockholder votes to, among other things, elect Defendants Vitale, Finkelstein, Stein, Davenport, and Nwamu to the Board and approve executive compensation. The 2025 Proxy Statement was authorized by the Board.

51. The 2025 Proxy Statement stated:

> The Board of Directors is responsible for the oversight of risk, while management is responsible for the day-to-day management of risk. The Board of Directors, directly and through its committees, carries out its oversight role by regularly reviewing and discussing with management the risks inherent in the operation of our business and applicable risk mitigation efforts. Management meets regularly to discuss our business strategies, challenges, risks and opportunities and reviews those items with the Board of Directors at regularly scheduled [meetings].

52. The 2025 Proxy Statement further represented that the Audit Committee's primary responsibilities include monitoring and overseeing "(a) the quality and integrity of our financial statements and financial reporting," "(d) our systems of internal accounting, financial controls and disclosure controls," and "(e) compliance with legal and regulatory requirements, codes of conduct and ethics programs." The 2025 Proxy Statement also stated that the Company's compensation policies and practices do not "encourage excessive and unnecessary risk-taking."

53. The 2025 Proxy Statement represented that the Company was dedicated to "creating long-term stockholder value" through strong corporate governance and that BellRing's "policy was to conduct [its] business with integrity and a commitment to providing value" to customers and consumers.

54. The representations in the 2025 Proxy Statement regarding the Board's risk oversight practices were false and misleading and omitted material information. Contrary to the representations made in the 2025 Proxy Statement, the Board was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2025 Proxy Statement contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices.

55. On February 2, 2026, BellRing filed with the SEC a Current Report on Form 8-K announcing, among other things, the election or reelection of Defendants Vitale, Finkelstein, Stein, Davenport, and Nwamu, and the approval of executive compensation, pursuant to the solicitations in the 2025 Proxy Statement.

**E. BellRing Is Sued In The Securities Class Action**

56. On January 22, 2026, the Securities Class Action was filed in the United States District Court for the Southern District of New York against the Company and Defendant Davenport and CFO Rode, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. The plaintiff seeks damages on behalf of a class who purchased or otherwise acquired BellRing shares between November 19, 2024 through August 4, 2025, inclusive. The plaintiff asserts that the named defendants issued materially false

and misleading statements and omitted material facts concerning the strength, sustainability and drivers of BellRing's sales growth, as well as the impact of competition on demand for the Company's products. As a result, BellRing faces potential liability for substantial monetary damages.

**F. Insider Trading By The Insider Seller Defendants**

57. While false and misleading statements and material omissions regarding BellRing's sales growth and customer demand inflated the Company's stock price, the Insider Seller Defendants sold 384,334 BellRing shares, reaping approximately $29.0 million in illicit proceeds.

58. Between February 10 and February 24, 2025, Defendant Vitale sold 368,334 shares for total proceeds of approximately $28.1 million at prices ranging from $72.65 to $77.52 per share, selling approximately 25% of his BellRing stock.

| Date | Shares | Avg. Price | Proceeds | Remaining | % Sold |
|---|---|---|---|---|---|
| Feb. 10 | 5,100 | $75.30 | $384,030 | 1,465,195 | 0.3% |
| Feb. 11 | 28,234 | $75.86 | $2,141,937 | 1,436,961 | 1.9% |
| Feb. 12 | 28,453 | $76.91 | $2,188,320 | 1,408,508 | 2.0% |
| Feb. 13 | 48,230 | $77.52 | $3,738,790 | 1,360,278 | 3.4% |
| Feb. 14 | 79,068 | $77.04 | $6,091,113 | 1,281,210 | 5.8% |
| Feb. 18 | 44,249 | $77.37 | $3,423,486 | 1,236,961 | 3.5% |
| Feb. 19 | 43,511 | $77.35 | $3,365,576 | 1,193,450 | 3.5% |
| Feb. 20 | 46,766 | $74.72 | $3,494,520 | 1,146,684 | 3.9% |
| Feb. 21 | 15,000 | $73.47 | $1,102,001 | 1,131,684 | 1.3% |
| Feb. 24 | 29,723 | $72.65 | $2,159,362 | 1,101,961 | 2.6% |
| **TOTAL** | **368,334** | **$76.23** | **$28,089,135** | **1,101,961** | **25.1%** |

59. Between May 30 and August 1, 2025, Defendant Davenport sold 16,000 BellRing shares for approximately $931,065.

60. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, BellRing has suffered significant harm, including destruction of over $2.9 billion in market

capitalization; exposure to significant liability in the Securities Class Action; substantial defense and investigation costs; and severe reputational damage to BellRing's credibility with investors, retail partners, and consumers.

## VI. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

61. Plaintiff brings this action derivatively and for the benefit of BellRing to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties and violations of federal securities laws as directors and officers of BellRing and other misconduct.

62. BellRing is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

63. Plaintiff is, and has been at all relevant times, a stockholder of BellRing and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of BellRing in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

64. Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. At the time this action was filed, the Board consisted of eight directors: Defendants Vitale, Davenport, Erickson, Stein, Johnson, Nwamu, Conway, and Finkelstein. The Board is neither disinterested nor independent.

### A. Demand Upon Defendant Vitale Is Excused

65. Vitale is not an independent director and accordingly BellRing's 2025 Proxy Statement does not list Vitale as an independent director. Vitale has held executive positions with BellRing and currently serves as President and CEO of Post Holdings, BellRing's former parent while serving as Chairman of the BellRing Board, reflecting his deep connections with both companies and his lack of independence therefrom. Through his positions as Chairman of Post

Holdings' board and the BellRing Board, Vitale exercises substantial control over both companies. BellRing's latest Annual Report on Form 10-K, filed with the SEC on November 18, 2025, specifically identifies "conflicting interests or the appearance of conflicting interests resulting from certain of our directors also serving as officers or directors of Post" as a material risk factor—an acknowledgment that the Company and its Board recognize the lack of independence and other conflicts created by Vitale's overlapping roles. At BellRing's January 29, 2026 annual meeting, stockholders signaled their concern: Vitale received only approximately 74% support for his reelection, far below the 95–99% range for all other director nominees.

66. Vitale authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

67. Vitale benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection on the BellRing Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

68. Vitale had a powerful incentive to inflate BellRing's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. Vitale sold 368,334 BellRing shares while in possession of material adverse non-public information, reaping proceeds of approximately $28.1 million. Thus, through materially false and misleading statements to the market about customer demand, BellRing's sales growth, and the effect of competition on BellRing's market share, Vitale sold BellRing stock at artificially inflated prices, reaping a material personal benefit not shared with other BellRing stockholders from the misconduct pled herein and he has a substantial likelihood of liability therefor.

69. Vitale, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with

all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Vitale taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

70. Vitale is neither disinterested nor independent. Any demand upon Defendant Vitale is futile and is, thus, excused.

**B. Demand Upon Defendant Davenport Is Excused**

71. Davenport is not an independent director. Davenport serves as the Company's President and Chief Executive Officer, and her continued employment and compensation depend on her fellow defendants not pursuing the claims asserted herein. Indeed, BellRing's 2025 Proxy Statement does not list Davenport as an independent director. In fiscal year 2025, Davenport received total compensation of $6,563,539; in fiscal year 2024, she received $9,901,653. Thus, Davenport could not consider a demand for action that might require her to sue the directors who control her continued employment and substantial compensation or fellow members of management with whom she works on a day-to-day basis.

72. Davenport authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

73. Davenport benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her reelection to the BellRing Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

74. Davenport is a named defendant in the Securities Class Action and faces a substantial likelihood of personal liability therefor.

75. Davenport had a powerful incentive to inflate BellRing's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. Davenport sold 16,000 BellRing shares while in possession of material adverse non-public information, reaping proceeds of approximately $931,065. Thus, through materially false and misleading statements to the market about customer demand, BellRing's sales growth, and the effect of competition on BellRing's market share, Davenport sold BellRing stock at artificially inflated prices, reaping a material personal benefit not shared with other BellRing stockholders from the misconduct pled herein and she has a substantial likelihood of liability therefor.

76. Davenport, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Davenport taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

77. Davenport is neither disinterested nor independent. Any demand upon Defendant Davenport is futile and, thus, excused.

**C. Demand Upon Defendant Erickson Is Excused**

78. Erickson and Vitale are both alumni of KPMG LLP and members of the St. Louis business community. Erickson spent approximately 35 years at KPMG (1980–2015); Vitale began his career there in 1987. Erickson was selected for BellRing's board in October 2019 by the Post Holdings–controlled nomination process, when Post held approximately 71% of BellRing's outstanding equity. Thus, Erickson is not independent of Vitale or the Company.

79. Erickson is retired, and the $295,770 in compensation he receives from BellRing is highly material to him. Erickson would not jeopardize this highly material compensation by taking action against BellRing's directors or officers who control his continued tenure on the Board. As such, Erickson cannot consider a demand with independence and disinterest.

80. Erickson authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

81. Erickson, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company, BellRing's compliance with relevant laws, rules, and regulations, the integrity of the Company's financial statements, and the review of earnings releases and financial guidance. Erickson utterly failed to perform these essential duties.

82. Erickson, as a member of the Corporate Governance and Compensation Committee, had the duty, among others, to ensure the implementation and effectiveness of BellRing's Code of Conduct and Corporate Governance Guidelines. Erickson utterly failed to perform these duties.

83. Erickson, as Lead Independent Director, had heightened responsibilities under the Corporate Governance Guidelines. Erickson utterly failed to perform these essential duties.

84. Erickson, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying

with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Erickson taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

85. Erickson is neither disinterested nor independent. Any demand upon Defendant Erickson is futile and, thus, excused.

**D. Demand Upon Defendant Stein Is Excused**

86. Stein was selected for BellRing's board by the Post Holdings–controlled nomination process and has served since the October 2019 IPO, when Post held approximately 71% of BellRing's outstanding equity. Stein has also served as a director of MidCap Financial Investment Corporation, an Apollo Global Management–managed business development company, since 2004, and has held directorships on multiple other Apollo-managed funds for over two decades. Stein served as BellRing's Lead Independent Director from the Company's IPO through July 2025 during which he failed to implement and maintain an effective system of internal controls to ensure compliance with all laws, rules, regulations governing the Company's core operations and complete and accurate disclosure and effectively oversee material risks facing BellRing. Stein has announced his retirement from BellRing's Board effective September 2026, further reducing any incentive to pursue claims against his fellow directors.

87. Stein authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Stein benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his

reelection to the BellRing Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

88. Stein, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company, BellRing's compliance with relevant laws, rules, and regulations, the integrity of the Company's financial statements, and the review of earnings releases and financial guidance. Stein utterly failed to perform these essential duties.

89. Stein, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Stein taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

90. Stein is neither disinterested nor independent. Any demand upon Defendant Stein is futile and, thus, excused.

**E. Demand Upon Defendant Johnson Is Excused**

91. Johnson's entanglement with Post Holdings extends beyond her dual BellRing/Post board service. Johnson simultaneously serves on the boards of three Post Holdings–affiliated entities: BellRing, Post Holdings, and Post Holdings Partnering Corporation, a Post-affiliated special purpose acquisition company. Johnson was appointed to the Post Holdings board in May 2021, when Post still held a majority ownership stake in BellRing, further evidencing her selection by and loyalty to Defendant Vitale's Post Holdings governance apparatus. Johnson serves on

BellRing's Corporate Governance and Compensation Committee—the very committee responsible for overseeing the governance policies and executive compensation practices at issue in this action—while simultaneously answering to Vitale in another boardroom. Thus, she cannot consider a demand to take action with the required independence and disinterest as that would require her to take action adverse to Vitale's interests.

92. Johnson simultaneously serves on the boards of both BellRing and Post Holdings, whose CEO, Defendant Vitale, is also BellRing's Chairman. This dual board service renders Johnson unable to exercise truly independent judgment in evaluating a demand against Vitale and the other Individual Defendants.

93. Johnson authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

94. Johnson, as a member of the Corporate Governance and Compensation Committee, had the duty, among others, to ensure the implementation and effectiveness of BellRing's Code of Conduct and Corporate Governance Guidelines. Johnson utterly failed to perform these duties.

95. Johnson, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Johnson taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

96. Johnson is neither disinterested nor independent. Any demand upon Defendant Johnson is futile and, thus, excused.

**F. Demand Upon Defendant Nwamu Is Excused**

97. Nwamu was appointed to BellRing's Board in May 2021, when Post Holdings still held a majority ownership stake in BellRing and controlled the director nomination process. Nwamu's appointment by the Post Holdings–controlled Board further evidences the structural entanglements described herein.

98. Nwamu authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Nwamu benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her reelection to the BellRing Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

99. Nwamu, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company, BellRing's compliance with relevant laws, rules, and regulations, the integrity of the Company's financial statements, and the review of earnings releases and financial guidance. Nwamu utterly failed to perform these essential duties.

100. Nwamu, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented

with red flags regarding misconduct or the lack of internal controls. Had Nwamu taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

101. Nwamu is neither disinterested nor independent. Any demand upon Defendant Nwamu is futile and, thus, excused.

**G. Demand Upon Defendant Conway Is Excused**

102. Conway is beholden to his fellow defendants. The Board would not sue itself or its fellow directors. Since fiscal year 2024, Conway has received approximately $543,750 in compensation from BellRing.

103. Conway authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

104. Conway, as Chair of the Corporate Governance and Compensation Committee, had the duty, among others, to ensure the implementation and effectiveness of BellRing's Code of Conduct and Corporate Governance Guidelines, and to recommend to the Board appropriate committee structures and membership. Conway utterly failed to perform these duties.

105. Conway, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Conway taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

106. Conway is neither disinterested nor independent. Any demand upon Defendant Conway is futile and, thus, excused.

**H. Demand Upon Defendant Finkelstein Is Excused**

107. Finkelstein is beholden to his fellow defendants. The Board would not sue itself or its fellow directors. Although Finkelstein joined the Board after the period of misconduct, he was appointed by the same Board that is subject to this action, creating an inherent loyalty to the directors who selected him.

108. Finkelstein's independence is further compromised by his institutional ties to BellRing and Post Holdings. From February 2018 through March 2025, Finkelstein served as Head of Consumer & Retail Mergers and Acquisitions at Citigroup Inc. During Finkelstein's tenure, Citigroup served as a lead bookrunning manager for BellRing's October 2019 initial public offering, as a joint lead book-runner for Post Holdings' August 2022 debt-for-equity exchange of BellRing stock, and as an additional book-runner for Post's November 2022 offering of its remaining BellRing shares. As Citigroup's most senior consumer and retail investment banking executive, Finkelstein operated within the institutional ecosystem that managed BellRing's most significant capital markets transactions and maintained relationships with BellRing and Post Holdings leadership. These institutional relationships informed the Board's decision to appoint Finkelstein and render him unable to impartially evaluate a demand adverse to the interests of the directors who selected him.

109. Finkelstein benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the BellRing Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

110. Finkelstein, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company, BellRing's compliance with relevant laws, rules, and regulations,

the integrity of the Company's financial statements, and the review of earnings releases and financial guidance. Finkelstein utterly failed to perform these essential duties.

111. Finkelstein, as a director of BellRing, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Finkelstein taken timely action, the damage caused to BellRing could have been prevented or at least minimized.

112. Finkelstein is neither disinterested nor independent. Any demand upon Defendant Finkelstein is futile and, thus, excused.

**I. Other Factors Demonstrating That Demand Upon The BellRing Board Is Excused**

113. BellRing's Board is dominated by Post Holdings, BellRing's former parent company. Post Holdings took BellRing public in October 2019, retaining approximately 71% of BellRing's outstanding equity. Post distributed 80.1% of its stake to Post stockholders in March 2022 while retaining substantial control over the Company and its Board.

114. First, three of eight directors have direct, current ties to Post Holdings. Vitale simultaneously serves as BellRing's Chairman and as President, CEO, and Chairman of Post Holdings. Johnson simultaneously serves on the boards of BellRing, Post Holdings, and Post Holdings Partnering Corporation, a Post-affiliated special purpose acquisition company.

Davenport spent her entire career in the protein nutrition space under Post Holdings' umbrella, serving as President of Post's Active Nutrition division before being installed as BellRing's CEO at Post's direction in September 2019.

115. Second, all five directors who served on BellRing's Board at the time of the October 2019 IPO—Vitale, Davenport, Erickson, Stein, and Johnson—were selected by or with the approval of Post Holdings when Post controlled approximately 71% of BellRing's outstanding equity. A sixth director, Nwamu, was appointed in May 2021 while Post still held a majority stake.

116. Third, following the March 2022 spin-off, Post continued to control BellRing through its providing the Company with finance, internal audit, treasury, information technology, insurance, and tax services under an Amended and Restated Master Services Agreement with a term of up to three years. Post and BellRing shared the same St. Louis headquarters address until BellRing relocated in late 2025. Both companies continue to use PricewaterhouseCoopers LLP as their independent registered public accounting firm. Vitale personally entered into an Amended and Restated Lock-Up Agreement with BellRing in connection with the spin-off.

117. A demand upon the Board to institute this action would require a majority of directors to take action adverse to the interests of Vitale with whom they are closely aligned and who controls their continuing as directors of the Company. Such a demand would be futile.

118. BellRing has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

119. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.

They have thus benefited from the wrongs herein alleged and have engaged themselves in self-dealing.

120. Publicly traded companies, such as BellRing, typically carry director and officer liability insurance ("D&O Insurance") from which the Company could potentially recover some or all of its losses. However, such insurance typically has limited coverage for actions within the scope of this Complaint—particularly where, as here, the insured directors are the very defendants from whom the Company seeks to recover, creating an "insured versus insured" exclusion that forecloses recovery if the directors voluntarily institute suit against themselves. The Board has not even attempted to pursue a recovery of the Company's damages from the D&O carrier.

## VII. CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder
### (Derivatively on Behalf of BellRing Against the Individual Defendants)

121. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

122. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

123. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

124. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

125. The 2025 Proxy Statement was materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2025 Proxy Statement contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices.

126. The misleading information contained in the 2025 Proxy Statement was material to BellRing shareholders in determining whether to elect or reelect Defendants Vitale, Finkelstein, Stein, Davenport, and Nwamu to the Board and approve the executive compensation.

127. The material misstatements and omissions in the 2025 Proxy Statement damaged the Company.

128. Plaintiff, on behalf of BellRing, seeks relief for damages inflicted upon the Company based on the misleading 2025 Proxy Statement in connection with the improper election or reelection of Defendants Vitale, Finkelstein, Stein, Davenport, and Nwamu and the approval of executive compensation.

**COUNT II**
**Contribution Under Section 21D of the Exchange Act**
**(Derivatively on Behalf of BellRing Against the Individual Defendants)**

129. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

130. The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

131. BellRing is named as a defendant in the Securities Class Action that alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If BellRing is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

132. As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, BellRing's general affairs, including the

content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

133. The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

134. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**COUNT III**
**Breach of Fiduciary Duties**
**(Derivatively on Behalf of BellRing Against the Individual Defendants)**

135. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

136. The Individual Defendants owed and owe fiduciary duties to BellRing. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe BellRing the highest obligation of good faith and loyalty in the administration of BellRing's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to BellRing alleged herein.

137. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

138. The Individual Defendants each violated their fiduciary duties to BellRing and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations

governing BellRing's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's sales growth, and competition facing the ready-to-drink protein category from which BellRing derives 86% of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. The Individual Defendants further breached their fiduciary duties to BellRing by, inter alia, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

139. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of BellRing's affairs and the use and preservation of its assets.

140. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, BellRing has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action.

141. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT IV**
**Derivative *Brophy* Claim for Insider Trading**
**(Derivatively on Behalf of BellRing Against the Insider Seller Defendants)**

142. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

143. Defendants Vitale and Davenport sold BellRing stock while in possession of material nonpublic information that artificially inflated the price of BellRing's stock.

144. By selling BellRing's stock while in the possession of material adverse nonpublic information that artificially inflated the price of BellRing stock, Defendants Vitale and Davenport exploited their positions at BellRing and breached their fiduciary duties to BellRing. Defendants Vitale and Davenport improperly benefited from their breaches of fiduciary duty and are liable to BellRing for their benefit therefrom.

145. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

## COUNT V
## Aiding and Abetting Breaches of Fiduciary Duty
## (Derivatively on Behalf of BellRing Against the Individual Defendants)

146. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

147. Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

148. In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

149. Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

150. Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT VI**
**Unjust Enrichment**
**(Derivatively on Behalf of BellRing Against the Individual Defendants)**

151. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

152. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BellRing, as a result of their compensation and director remuneration and the proceeds which they received as a result of their misstatements and material omissions, while breaching fiduciary duties owed to BellRing.

153. Further, the Insider Seller Defendants sold BellRing stock while in possession of material nonpublic information that artificially inflated the price of BellRing stock. As a result, the Insider Seller Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

154. Plaintiff, as a stockholder and representative of BellRing, seeks on behalf of the Company an order of this Court ordering the Insider Seller Defendants to disgorge and furnish restitution to BellRing of all profits, benefits, and other compensation obtained by them for their wrongful conduct and fiduciary breaches.

155. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of BellRing, demands judgment against the Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of BellRing and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to BellRing;

C. Declaring that the Individual Defendants violated Sections 14(a) and 21D of the Exchange Act;

D. Determining and awarding to BellRing the damages sustained by it as a result of the Individual Defendants' violations, jointly and severally, together with pre-judgment and post-judgment interest;

E. Directing the Individual Defendants to account for all damages sustained and profits made as a result of their wrongful conduct;

F. Directing BellRing and the Individual Defendants to reform and improve its compliance, internal control systems, and corporate governance practices and procedures to comply with applicable laws and protect the Company and its stockholders from a repeat of the damaging events described herein;

G. Awarding to BellRing restitution from the Individual Defendants, including disgorgement of all profits, benefits, and other compensation, including insider trading proceeds;

H. Directing the Individual Defendants to contribute to or reimburse the Company for any liability or damages incurred in connection with the Securities Class Action;

I. Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J. Granting such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 18, 2026

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
1000 N. West St., Suite 1500
Wilmington, DE 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WEISS LAW**

David C. Katz
Mark D. Smilow
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
msmilow@weisslawllp.com

Joshua M. Rubin
4 Brighton Rd., Ste. 204

Clifton, NJ 07014
Email: jrubin@weisslawllp.com

*Plaintiff's Counsel*